Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHEL DESTA, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>WINS FINANCE HOLDINGS INC., JIANMING HAO, RENHUI MU, AND JUNFENG ZHAO,<br><br>    Defendants. | Case No: 2:17-cv-02983-CAS-AGR<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Brian Gabrich, Christopher Ikeocha, and Raymond Mentor ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants,

– 1 –

United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wins Finance Holdings Inc. ("Wins" or the "Company"), interviews with relevant third-party witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Wins securities from February 23, 2016 through June 7, 2017, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").[1]

2.     During the Class Period, Wins engaged in a manipulative scheme to meet the eligibility criteria for inclusion in the Russell 2000 Index. Specifically, Wins falsely represented in its SEC filings that it maintained its principal executive offices in the United States.

3.     Being included in the Russell 2000 Index was critical to Wins because it allowed Wins, which had been struggling to meet Nasdaq Capital Markets ("Nasdaq")'s minimum shareholding requirements, to maintain a sufficient number of beneficial owners so that it could continue trading on

---

[1] Excluded from the class are all Defendants, the present and former officers and directors of Wins and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any such excluded persons have or had a controlling interest. Also excluded from the Class are persons who have a net profit in purchases and sales of Wins common stock or otherwise suffered no compensable damages under the securities laws during the Class Period.

Amended Class Action Complaint for Violations of the Federal Securities Laws

Nasdaq.

4.     Being a Nasdaq-listed company was very important for Wins because it gave them a readily-available source of financing, and the prestige of being a publicly-listed company in the United States was beneficial to Wins' business and reputation.

5.     Contrary to what Wins represented in its SEC filings, Wins in fact did not have its principal executive offices in the United States.  Wins' entire presence at its purported U.S. principal executive office was limited to a single barren, temporary desk in one small room located inside the offices of another business with unrelated owners. There wasn't even a sign designating the desk as being Wins' office.  No Wins director, officer, or employee ever worked there on a regular basis.

6.     When the truth about the fraudulent headquarters was finally revealed to the market on March 30, 2017, Wins stock price fell by 71% and investors lost over $57 million before Nasdaq halted its trading on June 7, 2017. The Russell 2000 removed Wins from its index two days after the halt on June 9, 2017.

7.     Wins is a Cayman Islands company with operations located primarily in Jinzhong City, Shanxi Province and Beijing, China. Wins' ordinary shares began trading on the Nasdaq under the symbol "WINS" on October 28, 2015 following a reverse merger.

8.     The Company principally provides financial guarantee, financial leasing and financial advisory services to Chinese micro to medium enterprises, to which Chinese commercial banks have been reluctant to lend due to higher credit risks and lack of credit support. According to its most recent annual report Form 20-F filed with the SEC on September 27, 2016, Wins earned $5.5 million in net revenue during the fiscal year ended June 30, 2016, with over 66.3% of its

revenues being generated in Jinzhong City, Shanxi Province, a coal mining center in China.

9.      Since its initial listing, due to low investor interest, Wins had been struggling to meet Nasdaq's 300 Round Lot Holder requirement for initial and continued listing under Nasdaq Listing Rules 5505(a)(3) and 5550(a), requiring Wins to have least 300 beneficial holders with ownership of units of 100 shares or more.

10.      Previously Nasdaq made a determination that Wins should be delisted from Nasdaq in December 2015 because it did not have sufficient shareholders to meet the 300 Round Lot Holder requirement for initial listing following the completion of the reverse merger.

11.      Although Wins' was able to maintain its listing on Nasdaq after appealing Nasdaq's delisting determination, the high risk that Wins would be delisted persisted because of investors' continued tepid interest in Wins.

12.      Indicative of Wins' inability to garner interest from investors was that during the 155 trade days from its initial listing on October 29, 2015 to June 10, 2016, Wins' average daily trade volume was merely 5,708 shares, a paltry number for a publicly-listed company.

13.      To ensure that more investors held Wins ordinary shares, Defendants set their eyes on the Russell 2000 Index. The Russell 2000 Index is a small-cap stock market index of the bottom 2,000 stocks in the Russell 3000 Index, which consists of the 3,000 largest U.S. public companies and nearly 100% of the capitalization of the U.S. stock market. The index is maintained by FTSE Russell. The Russell 2000 Index is by far the most common benchmark for mutual funds that identify themselves as "small-cap" and is the most widely-quoted measure of the overall performance of the small-cap to mid-cap company shares of the U.S. equity market. Currently, thirteen Exchange Traded Funds

– 4 –

Amended Class Action Complaint for Violations of the Federal Securities Laws

("ETFs") track the Russell 2000 Index with more than $38.54 billion in Exchange Traded Product assets.[2] Index funds that track the Russell 2000 are available from most major mutual fund families,[3] such as BlackRock's iShares Russell 2000 Small-Cap Index Fund and Charles Schwab's Schwab Small Cap Index Fund. These funds are usually passively managed by matching the performance of an index through holding all of the securities in the index, in the same proportions as the index.

14.     This means that if Wins is included in the Russell 2000 Index, all of the funds tracking the Russell 2000 Index would automatically purchase Wins shares to match the entire basket of stocks in Russell 2000 Index and Wins would be guaranteed to have enough beneficial holders to meet the Nasdaq 300 Round Lot Holders listing requirement.

15.     Prior to February 23, 2016, there was one critical factor preventing Wins from being in included in the Russell 2000 Index: the address of its principal executive offices was in China, rather than the U.S.

16.     Pursuant to the Russell U.S. Equity Indexes Constructions and Methodology maintained by FTSE Russell, FTSE Russell uses objective criteria, including a company's market value, headquarters and location of assets, among other factors, to assign companies to the U.S. equity market. All companies that are determined to be part of the U.S. equity market are included in the Russell U.S. indexes, including the Russell 2000 Index. Russell indexes use the data as of the last trading day of May each year to reevaluate each security for the purpose of inclusion and completely rebuild the reconstitutions in June annually.

---

[2]http://www.etf.com/channels/russell-2000-index-etfs
[3]https://www.forbes.com/2009/04/20/investing-index-moneybuilder-personal-finance-index.html

– 5 –

17.    By mendaciously misrepresenting the address of its principal executive offices as being in the U.S. in a Form 6-K filed with the SEC on February 23, 2016, Defendants fraudulently made Wins appear to satisfy the criteria for inclusion in the Russell 2000 Index before the Russell 2000 Index rebuilt its composition in June 2016.

18.    On June 10, 2016, following Wins' false representation that its principal executive offices were in the U.S., Wins was included in the newly reconstituted Russell 2000 Index.

19.    As indicated by the vertical lines in Wins' stock chart below, after FTSE Russell included Wins in the Russell 2000 Index, Wins trading volume immediately spiked up in June 2016 and began trading at an abnormally high volume for the next two months. The average daily trading volume from June 13, 2016 to August 5, 2016 was 31,259 shares, five times more than the average daily trading volume from the date of Wins' initial listing to June 10, 2016, the date that Wins was first included in the Russell 2000 Index. This unusual increase in trading volume was because the result of mutual funds and ETFs that track the Russell 2000 Index purchasing Wins shares in those two months in order to mirror the composition of securities in the newly reconstituted 2016 Russell 2000 Index – as they are required to do based on their announced strategies to track the Russell 2000 Index. Once those mutual funds and ETFs added Wins ordinary shares to their portfolios, the mutual funds and ETFs would passively hold Wins shares for the long term so long as Wins remained in the Russell 2000 Index. After August 2016 (i.e. after the initial flurry of funds purchasing Wins stock after Wins became included in the Russell 2000 Index in June 2016), Wins' trading volume dropped back to its previous normal daily trading volume of a few thousand shares at the maximum.

Amended Class Action Complaint for Violations of the Federal Securities Laws

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



(Source: Exhibit 3 - "This Chinese Stock Soared 4,500% on Nasdaq and No One Knows Why")

20.    On December 12, 2016, *Seeking Alpha* published an article titled, "Wins Finance And The Case Of The Missing Headquarters" ("December 12, 2016 Seeking Alpha Article") (attached hereto as **Exhibit 1**), which for the first time called into question whether Wins really had its principal executive offices at the U.S. address shown on its SEC filings. The article states that in actuality, an investment firm called ForeFront Capital Advisors, LLC, owned by former Wins Director Bradley Reifler, is located at that address.

21.    On this news, shares of Wins fell $45.50 per share or over 32% over two trading days to close at $92.50 per share on December 13, 2016.

22.    On January 9, 2017, Defendants, without any explanation, changed the address of Wins' principal executive offices as reported in its SEC filings from the U.S. back to China in a Form 6-K.

23.    On March 30, 2017, *Seeking Alpha* published an article titled "Wins Finance - Active SEC Investigation And Manipulation Of A Russell Index"

– 7 –

Amended Class Action Complaint for Violations of the Federal Securities Laws

("March 30, 2017 Seeking Alpha Article") (attached hereto as **Exhibit 2**), exposing in detail that Wins intentionally misrepresented that it was headquartered in the U.S. and connecting, for the first time, Defendants' misrepresentation of Wins' principal executive offices with Defendants intent to deceive the Russell 2000 Index into including Wins in its index. The same article also disclosed, based on SEC Freedom of Information Act ("FOIA") requests, that certain SEC enforcement activities were ongoing against Wins.

24.   On the same day, *Bloomberg* published an article titled "This Chinese Stock Soared 4,500% on Nasdaq and No One Knows Why" ("Bloomberg Article") (attached hereto as **Exhibit 3**), which provided comprehensive coverage on Wins' fraudulent misrepresentations concerning its purported headquarters in the U.S. and the correlation between Wins' switch of its principal office to the U.S. address and its inclusion in the Russell 2000. The Bloomberg article revealed that there were no signs of business at Wins' purported U.S. headquarters.

25.   On this news, shares of Wins fell $135.61 per share or over 48% over the next two trading day to close at $144.99 per share on March 31, 2017, further damaging investors.

26.   The revelation of Wins' fraudulent manipulation of the Russell 2000 Index criteria immediately prompted FTSE Russell to revise its criteria and address the concern over certain Chinese companies' deceitful schemes to obtain eligibility for Russell U.S. equity indexes. On April 3, 3017, FTSE Russell published "Russell US Index Reconstitution 2017 – China N Shares Construction & Methodology Update" ("Publication"), which specifically separated out Chinese companies that were controlled by Mainland Chinese entities or individuals and stated that these companies would not be considered for inclusion in the Russell U.S. indexes and would be removed even if they satisfy all other

– 8 –

Amended Class Action Complaint for Violations of the Federal Securities Laws

inclusion criteria in conjunction with the Russell U.S. index reconstitution. In the attachment to the Publication "Indicative N Share List as at 3 April 2017", Wins was listed as a China N Share, which means it would be removed from Russell 2000 Index at the time of the Index's June 2017 reshuffling.

27. Since FTSE Russell's announcement that Wins would be removed from the Russell 2000 Index on April 3, 2017, Wins' stock price plunged from the opening price of $146.49 per share on April 3, 2017 all the way to the closing price of $81 per share on June 6, 2017, the day before Nasdaq halted its trading, with the lowest price reaching $19.8901 per share on June 1, 2017.



(Source: "China Company That Soared 4,500% Is Puzzled Again by New Surge"[4])

28. On June 7, 2017, Nasdaq halted trading in Wins' shares for "additional information requested" from the Company.

---

[4] https://www.bloomberg.com/news/articles/2017-06-07/china-company-that-soared-4-500-is-puzzled-again-by-new-surge

Amended Class Action Complaint for Violations of the Federal Securities Laws

29.     On June 9, 2017, FTSE Russell communicated the preliminary composition of the Russell 2000 Index to the marketplace and Wins was not included in the preliminary list. The newly reconstituted Russell 2000 Index which removed Wins officially took effect after the close of trading on June 23, 2017.

30.     On August 9, 2017, Wins announced that it received a delisting determination letter from Nasdaq due to violations of (i) Listing Rule 5101, due to public interest concerns relating to alleged misrepresentations made to Nasdaq relating to the 300 round lot shareholder requirement in Rule 5505(a), (ii) Listing Rule 5250, due to the making of alleged misrepresentations by the Company relating to the 300 round lot shareholder requirement in Rule 5505(a), (iii) Listing Rule 5505(a), due to an alleged failure to meet the 300 round lot shareholder requirement at the time of its initial listing, and (iv) Listing Rule 5550(a), due to an alleged failure of the Company to currently meet the 300 round lot shareholder requirement.

31.     As of today, trading in Wins shares is still halted, causing substantial damage to Plaintiffs and all putative class members.

## II.     **JURISDICTION AND VENUE**

32.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

33.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

34.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a

Amended Class Action Complaint for Violations of the Federal Securities Laws

significant portion of Defendants' actions and the subsequent damages, took place in this judicial district.

35.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.   PARTIES

36.     Plaintiffs, as set forth in their PSLRA certifications previously filed with the Court, purchased Wins ordinary shares at artificially inflated prices during the Class Period and were economically damaged by Defendants manipulation of Wins stock price and upon the public disclosure of true facts concerning Wins.

37.     Defendant Wins is a company that provides financing solutions to small and medium enterprises, including microenterprises, in China. It offers services in the areas of financial leasing, guarantee and advisory services. The company was founded in 2006. Wins went public on the U.S. stock market on October 28, 2015 via a reverse merger. Wins' ordinary shares were traded on Nasdaq under the ticker "WINS"; its trading has been halted since June 7, 2017.

38.     From October 28, 2015 to February 22, 2016, the Company had reported in its SEC filings that its principal executive offices were located at 1F, Building 7, No. 58 Jianguo Road, Chaoyang District, Beijing 100024, People's Republic of China (the "Chinese Address").

39.     From February 23, 2016 to January 8, 2017, Wins changed the reported address of its principal executive offices to 7 Times Square, 37th Floor, New York, NY 10036 (the "U.S. Address") in its SEC filings without any explanation. After the validity of its U.S. Address was called into question, the

– 11 –

Company again quietly switched its principal executive offices back to the Chinese Address.

40.     Defendant Jianming Hao ("Hao") was the Co-Chief Executive Officer ("CEO"), Director and Chairman of the Board of Directors of the Company from the beginning of the Class Period to April 2, 2017.  Hao resigned from those positions on April 3, 2017.

41.     Defendant Renhui Mu ("Mu") served as the Co-CEO and Chief Operating Officer ("COO") of the Company from the beginning of the Class Period to April 2, 2017. From April 3, 2017 to the end of the Class Period, Mu was the CEO and Chairman of the Board of Directors. Mu first began serving on the Board of Directors in July 2016.

42.     Defendant Junfeng Zhao ("Zhao") served as the Chief Financial Officer ("CFO") of the Company from August 2016 through the end of the Class Period. Zhao has also been a Director of the Company since April 3, 2017.

43.     Defendants Hao, Mu and Zhao are collectively referred to herein as the "Individual Defendants."

44.     Each of the Individual Defendants:

> (a)     directly participated in the management of the Company;
>
> (b)     was directly involved in the day-to-day operations of the Company at the highest levels;
>
> (c)     was privy to confidential proprietary information concerning the Company and its business and operations;
>
> (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;
>
> (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

Amended Class Action Complaint for Violations of the Federal Securities Laws

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

45.     Wins is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

46.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Wins under *respondeat superior* and agency principles.

47.     Defendants Wins and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     **RELEVANT NON-PARTIES**

48.     Richard Xu ("Xu") was the President and a Director of Wins from the inception of Wins' public listing through July 25, 2016. Previously, Xu formed a company called Sino Mercury Acquisition Corp. ("Sino") on March 28, 2014; Sino was a blank check company formed in order to effect a merger, capital stock exchange, asset acquisition or other similar business combination with one or more businesses or entities. Sino went public on Nasdaq on September 2, 2014. Sino was merged into Wins through a reverse merger in October 2015, enabling Wins to become a publicly-traded company in the U.S. Upon consummation of the reverse merger between Sino and Wins, Xu, through a company he controlled, owned 204,005 ordinary shares of Wins.

49.     Bradley Reifler ("Reifler") served as a Director and member of the Audit Committee, Compensation Committee, and Nominating Committee of

– 13 –

Wins since its initial listing until March 20, 2016. Reifler helped Xu form Sino, and in addition to Xu, Reifler was one of the five initial shareholders of Sino. Reifler also founded and was the CEO of ForeFront Capital Advisors, LLC ("ForeFront"), a financial services firm. Currently, Reifler's son Cole Reifler serves as the President of ForeFront. The U.S. address that Wins falsely represented as its principal executive offices is actually a small room located within ForeFront's offices in New York. Xu and Reifler have worked on many financial transactions as partners and are very familiar with each other.

## V.   CONFIDENTIAL WITNESS

50.    This Complaint relies in part on allegations drawn from an interview with a confidential witness who is an employee at ForeFront in its New York office (i.e. the same address as Wins' purported U.S. Address.). The confidential witness has personal knowledge of Wins' U.S. operations at Wins' purported U.S. address. The confidential witness' position and tenure are set forth below:

| Witness | Position | Job function | Tenure |
|---|---|---|---|
| Witness 1 ("CW1") | Senior Staff Member of Forefront Capital Advisors, LLC | Senior staff person participating in managing all aspects of ForeFront Capital's business. | Employed at Forefront from at least January 10, 2015 to March 10, 2017 |

(Plaintiffs are maintaining the identity of the witness confidential to protect him from any retaliation.  Plaintiffs will provide the Court the identity of the witness, along with more specific details of CW1's role at Forefront Capital, should the Court request it.)

## VI.   SUBSTANTIVE ALLEGATIONS

– 14 –

Amended Class Action Complaint for Violations of the Federal Securities Laws

## **Background**

51.    Wins started trading on Nasdaq on October 28, 2015 through a reverse merger with Sino Mercury Acquisition Corp., a special purpose acquisition company, or SPAC, created by Xu with help from Reifler. Since its initial listing, Wins was constantly plagued by investor disinterest, particularly a lack of institutional investor interest, which resulted in lethargic trading volume and a scarcity of shareholders.

52.    On December 15, 2015, Wins disclosed in a Form 8-K that it received a notice from Nasdaq's Listing Qualifications Department stating that the staff of Nasdaq (the "Staff") had determined that Wins had not demonstrated that it met the 300 "Round Lot Holder" requirement for initial listing following the completion of the reverse merger and would be subject to delisting (the "Nasdaq 2015 Delisting Determination").

53.    Nasdaq Listing Rules 5505(a) "Initial Listing Requirements for Primary Equity Securities" requires that a company applying to list its primary equity security on Nasdaq must have at least 300 Round Lot Holders", which means Wins must have at least 300 beneficial holders with ownership of 100 Wins ordinary shares or more.

54.    Further, to keep its listing, Wins had a continuing duty to maintain 300 Round Lot Holders during the entire course of its listing on Nasdaq. Nasdaq Listing Rules 5550(a): "Continued Listing of Primary Equity Securities" requires that A Company that has its Primary Equity Security listed on the Capital Market must continue to have 300 Public Holders".  "Public Holders" means holders of a security that includes both beneficial holders and holders of record, but does not include any holder who is, either directly or indirectly, an executive officer, director, or the beneficial holder of more than 10% of the total shares outstanding.

Amended Class Action Complaint for Violations of the Federal Securities Laws

55.     Although by appealing the Nasdaq 2015 Delisting Determination before the Nasdaq Listing Qualifications Panel, Wins managed to keep itself listed on Nasdaq after February 18, 2016, Wins was still faced with the imminent risk that it could be delisted anytime due to the lack of outside shareholders. In the 155 trading days since its initial trading on October 29, 2015 to June 10, 2016, Wins' average daily trading volume was merely 5,708 shares. Among the 21,526,756 outstanding ordinary shares, Wins' insiders owned 93.1%. Only 6.8% of ordinary shares were in the public float, i.e. available for the public to purchase and trading. According to data compiled by Bloomberg, only about 9% of available shares are held by institutional investors.[5]

56.     Defendants faced an urgent need to find a solution for the high probability that Nasdaq would delist WINS shares for not meeting the listing requirements. They found that inclusion into the Russell 2000 Index would be a perfect fix.

## Defendants Manipulated The Address Of Its Principal Executive Offices To Meet Russell 2000 Index Inclusion Criteria

57.     Russell U.S. Indexes are maintained by FTSE Russell, a British provider of stock market indices and associated data services, wholly owned by the London Stock Exchange. Today most of the world's top financial institutions and their clients use FTSE Russell. The top ten investment banks, 97 out of 100 of the top asset managers, 48 out of 50 of the top plan sponsors and the top five global custodians all utilize FTSE indexes to benchmark their investment performance and create ETFs, index funds, structured products and index-based derivatives.[6]

_____

[5] https://www.bloomberg.com/news/articles/2017-03-30/this-chinese-stock-soared-4-500-on-nasdaq-and-no-one-knows-why
[6] http://www.ftserussell.com/about-us

– 16 –

Amended Class Action Complaint for Violations of the Federal Securities Laws

58.    The Russell 2000 Index, as part of the Russell U.S. Indexes, was introduced in 1984 as the financial industry's first small cap bench mark. The Russell 2000 Index measures the performance of the bottom 2,000 companies in the Russell 3000 Index (based on market capitalization), which is made up of 3,000 of the biggest U.S. stocks. Since its inception, the Russell 2000 Index has been widely adopted by both institutional and retail investors for measuring the performance of the U.S. small cap asset class and benchmarking the performance of active small cap managers. As of December 31, 2013, approximately 97% of institutional U.S. small cap products were benchmarked against the Russell 2000.[7]

59.    The Russell 2000 Index ranked eligible U.S. securities based on their total market capitalization on the last trading day in May of each year and rebuilds its index annually.

60.    FTSE Russell uses objective criteria to assign companies to its U.S. equity market indexes. All companies that are determined to be part of the U.S. equity market are included in the Russell U.S. indexes, such as the Russell 2000 Index, and those determined to be non-U.S. become members of the Russell Global ex-U.S. Index.

61.    Pursuant to Russell U.S. Equity Indexes Construction and Methodology published in December 2015, which was the then-current version that applied to Russell's designation of WINS as a U.S. equity:

> "If a company incorporates in, has a stated headquarters location in, and also trades in the same country, (ADRs and ADSs are not eligible), the company is assigned to its country of incorporation. If any of the three criteria do not match, Russell then defines three home country indicators

---

[7] http://www.ftserussell.com/sites/default/files/research/the_russell_2000_index-30_years_of_small_cap_final.pdf

Amended Class Action Complaint for Violations of the Federal Securities Laws

(HCIs). The HCIs are as follows:

> 1. Country of incorporation
>
> 2. Country of headquarters
>
> 3. Country of the most liquid exchange as defined by two-year average daily dollar trading volume (ADDTV) from all exchanges within a country

After the HCIs are defined, the next step in the country assignment involves an analysis of assets by location. FTSE Russell cross-compares the primary location of the company's assets with the three HCIs. If the primary location of assets matches any of the HCIs, then the company is assigned to its primary asset location (see Appendix B for specifics on the definition of primary asset/revenue location).

If there is not enough information to determine a company's primary location of assets, FTSE Russell uses the primary location of the company's revenue for the same cross-comparison and assigns the company to the appropriate country in a similar fashion. FTSE Russell uses an average of two years of assets or revenue data for analysis to reduce potential turnover.

If conclusive country details cannot be derived from assets or revenue, FTSE Russell assigns the company to the country in which its headquarters are located unless the country is a Benefit Driven Incorporation (BDI) country[8]. If the country in which its headquarters are

---

[8] Benefit Driven Incorporation (BDI) countries, as listed in Appendix B of the same document, are small, low-tax jurisdiction specializing in providing corporate and commercial services to non-resident offshore companies, and for the investment of offshore funds, such as Cayman Islands, Brattish Virgin Islands, Bermuda, Bahamas, etc.

Amended Class Action Complaint for Violations of the Federal Securities Laws

located is a BDI, the company is assigned to the country of its most liquid stock exchange.

**Steps to determining U.S. country assignment:**

| STEP 1 | Is the company incorporated in, traded in, and headquartered all in one unique country? | YES – Classified in the unique country | NO – Move to Step 2 |
|---|---|---|---|
| STEP 2 | Are the company's reported assets primarily located in one of the HCIs? | YES – Classified in the country of primary assets | NO – Move to Step 3 |
| STEP 3 | Are the company's reported revenues primarily derived from one of the HCIs? | YES – Classified in the country of primary revenue | NO – Move to Step 4 |
| STEP 4 | Is the company headquartered in a non-BDI country? | YES – Classified in the country of headquarters | NO – Assigned to primary exchange country |

Note: If the company does not trade on a major U.S. exchange it is not eligible."

62.    FTSE Russell defines headquarters as the address of principal executive offices. For those companies reporting in the U.S., FTSE Russell uses SEC filings to determine the location of headquarters.[9]

63.    From 2015 through February 22, 2016, in the reverse merger documents and all filings Wins made with the SEC, as well as all the other

---

[9] Russell U.S. Equity Indexes Construction and Methodology, December 2015, Appendix B.

Amended Class Action Complaint for Violations of the Federal Securities Laws

disclosures it made to the public, Wins consistently claimed that its principal executive offices were located at 1F, Building 7, No. 58 Jianguo Road, Chaoyang District, Beijing 100024, People's Republic of China ("Chinese Address").

64.   On February 23, 2016, Wins, for the first time and without any explanation, used 7 Times Square, 37th Floor, New York, NY 10036 ("U.S. Address") as the address of its principal executive offices, instead of the Chinese Address, in a Form 6-K.

65.   Such change is extremely significant and immediately made Wins stock a U.S. security eligible to be considered for inclusion within the Russell 2000 Index. Given that Wins' country of incorporation (i.e. Cayman Islands), country of headquarters (either China or U.S. depending on how Wins reported to the SEC) and country of the most liquid exchange (i.e. U.S. as it is traded on a major U.S. stock exchange) are not identical, Wins had to go through the four steps that FTSE Russell provided in the Russell U.S. Equity Indexes Construction and Methodology to determine whether it could be assigned to the U.S. equity market and be considered to be included in any of the Russell U.S. Indexes, including Russell 2000 Index.

66.   Among the three home country indicators set forth by FTSE Russell, the easiest one to be manipulated by Wins is the address of its principal executive offices because FTSE Russell only looked at SEC filings, rather than conducting any independent investigation to verify the truth of such reporting.

67.   The decisive impact of Wins' single manipulation of the address of its principal executive offices can be demonstrated in the following comparison chart:

**Wins' three home country indicators (HCIs):**

    1. Country of incorporation – Cayman Islands

    2. Country of headquarters – China or U.S., depending on Win's self

reporting to the SEC

3. Country of the most liquid exchange – U.S. because Wins is traded on Nasdaq

| Steps taken by FTSE to determine U.S. country assignment | When Wins used its China Address for its principal executive offices | When Wins used the U.S. Address for its principal executive offices |
|---|---|---|
| Step 1: Is the company incorporated in, traded in, and headquartered in one unique country? | No | No |
| Step 2: Are the company's reported assets primarily located in one of the HCIs? | Yes<br><br>Wins' assets are primarily located in China, where its principal executive offices are located<br><br>Assigned to China | No<br><br>Wins' assets are primarily located in China, different from any of the HCIs<br><br>Go to Step 3 |
| Step 3: Are the company's reported revenues primarily derived from one of the HCIs? |  | No<br><br>Wins derives almost all its revenue from China, different from any of the HCIs.<br><br>Go to Step 4 |
| Step 4: Is the company headquartered in a non-BDI country? |  | No<br><br>Assigned to Wins primary exchange country – U.S. |
| Result: Assignment to the U.S. equity market and eligible to be considered for | No.<br><br>Cannot be considered for Russell U.S. | Yes.<br><br>Wins is eligible to be considered for |

– 21 –

| inclusion in Russell U.S. indexes | Indexes. | inclusion in Russell 2000 Index. |
|---|---|---|

68.     With just one simple clandestine manipulation before May 2016, Wins became eligible to be included in the new 2016 Russell 2000 Index, the financial industry's leading small cap index, and approximately 97% of institutional U.S. small cap products that were benchmarked against the Russell 2000 Index would start purchasing Wins stock on Nasdaq. Wins would have enough shareholders to meet the 300 Round Lot Holders requirements under the Nasdaq continued listing standards and Defendants would no longer be concerned that Nasdaq would delist Wins.

69.     On February 23, 2016, Wins executed this machination and reported, for the first and without any explanation, its principal executive offices at the U.S. Address in a Form 6-K.

70.     Not coincidentally, the U.S. Address that Defendants reported as Wins' principal executive offices was the address of ForeFront, whose owner Reifler was then a director of Wins and close business partner of Xu, the then President of Wins. Xu owned 204,005 ordinary shares of Wins, and Reifler owned 5,100 shares of Wins at the time.[10] Thus, Reifler, Xu and Defendants all shared a concerted interest in letting Wins use the U.S. Address to carry out Defendants' scheme and permanently eliminate the risk that Wins would be delisted.

71.     Using a Wins' Director's business address in the U.S. was the least risky, and indeed most convenient, way to falsely change the address of Wins' principal executive offices to the U.S. Reifler could conveniently help cover up

---

[10] Reifler sold his 5,100 Wins shares back to the Company on June 28, 2016 for $68,180.

Amended Class Action Complaint for Violations of the Federal Securities Laws

the truth that no Wins employee worked at that address if any reporters or analysts had suspicions and wanted to interview him about it.  And indeed, Reifler did try to cover up Wins' duplicity when Bloomberg interviewed him for the March 30, 2017 Bloomberg Article[11]. Reifler told Bloomberg that he let 3 Wins employees use ForeFront's offices at the U.S. Address but he wouldn't reveal their names. He also indicated that he let Xu work at ForeFront's offices. But as evidenced by CW1's testimony below, Reifler's attempted cover-up is nothing more than a blatant lie. None of Wins' employees worked at the U.S. Address.

72.    As expected, Wins was added to the new 2016 Russell 2000 Index on June 10, 2016. As the mutual funds and ETFs reshuffled their portfolio, adding new securities that were freshly included in the 2016 Russell 2000 Index and selling off securities that were no longer in the 2016 Russell 2000 Index to track the newly effective 2016 Russell 2000 over the next two months, Wins' trading volume immediately jumped up and stayed at an abnormally high level for the next two months. The average daily trading volume from June 13, 2016 to August 5, 2016 was 31,259 shares, five times more than the average daily trading volume from Wins' initial listing to June 10, 2016, the date Wins was included in the Russell 2000 Index.

**Wins Conducted No Business At The U.S. Address And**
**Misrepresented Its Principal Executive Offices**

73.    In fact, Defendants lied about the location of Wins' principal executive offices.

74.    CW1 worked for Forefront Capital at the U.S Address.  He stated that during the Class Period, there was one temporary desk for Xu at the U.S.

---

[11] https://www.bloomberg.com/news/articles/2017-03-30/this-chinese-stock-soared-4-500-on-nasdaq-and-no-one-knows-why

Amended Class Action Complaint for Violations of the Federal Securities Laws

Address and no space for other Wins employees.

75.    According to CW1, no one answered phone calls for Wins. Xu "would just come in, but not for long, then leave." "[Xu] did that once every month or, probably closer to every other month."

76.    CW1 also said that the temporary desk for Xu had been there for a couple years and it wasn't outfitted with the typical useful things one finds on an office desk – paperclips, notepads, etc. and it was not personalized in any way.

77.    CW1 also did not recall Wins ever receiving calls at the U.S. Address.

78.    CW1 was not familiar with Wins' Co-CEO Jianming Hao, or his counterpart Renhui Mu. CW1 was not aware of Wins' CFO Junfeng Zhao, Director Haiming Guo, Director Guo Chen or former CFO Amy He. CW1 only saw former president Xu came by the Forefront office (the U.S. Address) and not any other Wins employees.

79.    CW1 stated that he last recalled seeing Xu at the U.S. Address in approximately late 2016 or early 2017.

80.    CW1 said that given the lack of space available to Wins at the U.S. Address, and the lack of Wins personnel who worked from the location, CW1 is surprised that the company considered the office as its headquarters.

81.    News articles have further corroborated statements that no Wins employees worked at the U.S. Address and Wins did no business at the U.S. Address.

82.    The March 30, 2017 Bloomberg Article reports that there aren't any signs of business for Wins at the U.S. Address. The U.S. Address is actually occupied by Forefront, which is owned by Reifler.

83.    The March 30, 2017 Seeking Alpha Article also reports that the headquarters and contact numbers that Wins provided in SEC filings are

– 24 –

misleading because none of the management team is onsite at the U.S. Address and no one can be reached at the phone numbers for the U.S. Address that Wins provided as the U.S. Address.

<u>**Materially False And Misleading**</u>

<u>**Statements Issued During The Class Period**</u>

84.     The Class Period begins on February 23, 2016 when Wins falsely stated in a Form 6-K filed with the SEC that Wins' principal executive offices were located at 7 Times Square, 37th Floor, New York, NY 10036.

85.     Wins had 19 filings with the SEC from February 23, 2016 to January 6, 2017, each of them fraudulently designating the U.S. Address as its principal executive offices.

86.     On September 27, 2016, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the fiscal year ended June 30, 2016 (the "2016 20-F"). The 2016 20-F was signed by Defendants Hao, Mu, and Zhao. The 2016 20-F contained signed Sarbanes-Oxley Act ("SOX") certifications by Defendants Hao, Mu, and Zhao attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

87.     The 2016 20-F continued the fraudulent designation of the U.S. Address as its principal executive offices.

88.     On October 24, 2016, the Company filed an amendment to the 2016 20-F (the "2016 20-F/A"). The 2016 20-F/A was signed by Defendants Hao, Mu, and Zhao. The 2016 20-F contained signed SOX certifications by Defendants Hao, Mu, and Zhao attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

Amended Class Action Complaint for Violations of the Federal Securities Laws

89.     The 2016 20-F/A continued the fraudulent designation of the U.S. Address as its principal executive offices.

90.     The statements contained in ¶¶ 84-89 were materially false and/or misleading and/or failed to disclose that: (1) Wins did not maintain its principal executive offices in the United States; and (2) Defendants intentionally misrepresented that its principal executive offices were located in the U.S. in order to be included in the Russell 2000 index to increase its trading volume and number of shareholders.

### The Truth Emerges

91.     On December 12, 2016, *Seeking Alpha* published the article, "Wins Finance And The Case Of The Missing Headquarters", which for the first time brought attention to the fact that no records showed that Wins existed at the U.S. address that it represented in its SEC filings as the address of its principal executive offices. The Seeking Alpha article noted that ForeFront, which is owned by Reifler, a former Wins Director, occupies that address.

92.     On this news, shares of Wins fell $45.50 per share or over 32% over two trading days to close at $92.50 per share on December 13, 2016.

93.     The December 12, 2016 Seeking Alpha Article did not reveal that the purpose and effect of Wins' phony office address was to have Wins included in the Russell 2000 Index so as to create artificial investor demand for Wins shares and thereby inflate its share price.

94.     On January 9, 2017, Defendants, without any explanation, changed the reported address of Wins principal executive offices from the U.S. back to China in a Form 6-K.

95.     Notwithstanding the correction of its principal executive offices, Wins shares continued to be included in the Russell 2000 Index, and thus

Amended Class Action Complaint for Violations of the Federal Securities Laws

continued to be subject to artificial investor demand, and traded at an inflated stock price.

96.     On March 30, 2017, *Seeking Alpha* published an article titled "Wins Finance - Active SEC Investigation And Manipulation Of A Russell Index", revealing that the headquarters address and phone number in Wins' SEC filings were false.  The article revealed that Defendants intentionally used the spurious U.S. Address to "trick" FTSE Russell into including Wins in the Russell 2000 Index based on FTSE Russell's Home Country Indicator Test so as to create artificial demand for WINS shares and inflate its stock price.

97.     On the same day, *Bloomberg* published the article "This Chinese Stock Soared 4,500% on Nasdaq and No One Knows Why", which provided comprehensive coverage on Wins' ruse concerning its headquarters in the U.S. and the correlation between Wins' switch of its principal office to the U.S. address and its inclusion in the Russell 2000 Index. The Bloomberg article revealed that there were no signs of any business at Wins' U.S. headquarters.

98.     When these two news articles disclosed to investors that the purpose and effect of Wins misrepresenting the location of its headquarters was to get included in the Russell 2000 Index and create artificial demand for its shares, Wins' share price fell $135.61 per share or over 48% over the next two trading day to close at $144.99 per share on March 31, 2017, further damaging investors.

99.     The exposure of Wins' fraudulent manipulation of the Russell 2000 Index criteria immediately prompted FTSE Russell to revise its criteria for its Home Country Indicator Test. On April 3, 3017, FTSE Russell published "Russell US Index Reconstitution 2017 – China N Shares Construction & Methodology Update" ("Publication"), which specifically separated out Chinese companies that were controlled by Mainland Chinese entities or individuals and stated that these companies would not be considered for inclusion in the Russell

– 27 –

U.S. indexes and would be removed even if they satisfy all other inclusion criteria in conjunction with the Russell U.S. index reconstitution. Specifically, Wins, in conjunction with other Chinese N Shares, would be removed from 2017 Russell 2000 Index in June 2017.

100.   Following FTSE Russell's April 3, 2017 announcement, Wins' stock price plunged from an opening price of $146.49 per share on April 3, 2017 all the way to a closing price of $81 per share on June 6, 2017, the day before Nasdaq halted trading in Wins shares, with the lowest price reaching $19.8901 per share on June 1, 2017.

101.   On June 7, 2017, Nasdaq halted trading in Wins' shares for "additional information requested" from the Company.

102.   On June 9, 2017, FTSE Russell published the preliminary 2017 Russell 2000 Index. Wins was not included in the preliminary list. The newly reconstituted Russell 2000 Index, which excluded Wins, officially took effect after the close of trading on June 23, 2017.

103.   On August 9, 2017, Wins announced that it received a delisting determination letter from Nasdaq for violations of (i) Listing Rule 5101, due to public interest concerns relating to alleged misrepresentations made to Nasdaq relating to the 300 round lot shareholder requirement in Rule 5505(a), (ii) Listing Rule 5250, due to the making of alleged misrepresentations by the Company relating to the 300 round lot shareholder requirement in Rule 5505(a), (iii) Listing Rule 5505(a), due to an alleged failure to meet the 300 round lot shareholder requirement at the time of its initial listing, and (iv) Listing Rule 5550(a), due to an alleged failure of the Company to currently meet the 300 round lot shareholder requirement.

Amended Class Action Complaint for Violations of the Federal Securities Laws

104.   As of today, trading in Wins' shares is still halted, essentially rendering its stock worthless and causing damage to Plaintiffs and all putative class members.

### Additional Allegations Supporting Scienter

105.   The March 30, 2017 Seeking Alpha Article also revealed that based on an SEC Freedom of Information Act ("FOIA") request that the author submitted to the SEC for information on any investigations into Wins, it appeared that certain SEC enforcement activities against Wins were ongoing.



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

                                        March 7, 2017



    Re:  Freedom of Information Act (FOIA), 5 U.S.C. § 552
         Request No. 17-01786-FOIA

Dear

    This letter responds to your request, dated and received in this office on February 17, 2017, for all documents in the possession of the SEC, dated from January 1, 2015 through February 17, 2017, that pertain to ==investigations regarding Wins Finance.==

    ==We are withholding records that may be responsive to your request under 5 U.S.C. § 552(b)(7)(A), 17 CFR § 200.80(b)(7)(i). This exemption protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities.== Since Exemption 7(A) protects the records from disclosure, we have not determined if other exemptions apply. Therefore, we reserve the right to assert other exemptions when Exemption 7(A) no longer applies.

106.   Based on the Plaintiffs' own FOIA request to the SEC, the SEC's investigation is still ongoing.

107.   Furthermore, several Wins directors and officers were involved in companies that have been found to have committed fraud on the U.S. security

market.

108.    For example, the current CFO of Wins, Junfeng Zhao, served as the financial controller at Agria Corp. from 2006 to 2010. Agria, a Hong Kong-based agriculture company, was delisted by the New York Stock Exchange ("NYSE") in January of this year after the NYSE found that the company and its insiders engaged in a manipulative pump-and-dump scheme to artificially inflate the price of its stock and maintain its Nasdaq listing. Agria was sued for securities fraud in a class action, which was settled and is pending final court approval.

109.    Reifler, a controversial financier, founded Pali Capital in 1996. JPMorgan Chase sued Reifler in 2011 in the U.S. District Court for the Southern District of New York over loan guarantees Reifler provided for Pali. The bank asked the court to seize Reifler's 144 acre estate in upstate New York. In March 2017, the court held Reifler in contempt and ordered him to pay or face prison time. Reifler filed for personal bankruptcy in January 2017.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE
### Fraud-on-the-Market Doctrine

110.    At all relevant times, the market for Wins ordinary shares was an efficient market for the following reasons, among others:

    (a) Wins ordinary shares were listed and actively traded on the Nasdaq, a highly efficient and automated market;

    (b) As a regulated issuer, Wins filed periodic public reports with the SEC;

    (c) Wins regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public

– 30 –

disclosures, such as communications with the financial press and other similar reporting services;

(d) Unexpected material news about Wins was rapidly reflected and incorporated into the Company's stock price during the Class Period.

111.   As a result of the foregoing, the market for Wins ordinary shares promptly digested current information regarding Wins from all publicly available sources and reflected such information in the price of Wins ordinary shares. Under these circumstances, all purchasers of Wins ordinary shares during the Class Period suffered similar injury through their purchase of Wins ordinary shares at artificially inflated prices, and a presumption of reliance applies.

### *AFFILIATED UTE*

112.   Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### VIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

113.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired publicly traded Wins securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Wins, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

– 31 –

Amended Class Action Complaint for Violations of the Federal Securities Laws

114.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wins securities were actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

115.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

116.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

117.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Wins;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Wins to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and SEC filing

- whether the prices of Wins' securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

118.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

**For Violations of Section 10(b) And Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

119.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

121.   The Class Period for Count I is from February 23, 2016, when Wins first misrepresented to the public that its principal executive offices were in the U.S., to April 3, 2017, when FTSE Russell announced that Wins would be removed from the Russell 2000 Index.

Amended Class Action Complaint for Violations of the Federal Securities Laws

122.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5(b) in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wins securities during the Class Period.

124.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Wins were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Wins, their control over, and/or receipt and/or modification of Wins' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Wins, participated in the fraudulent scheme alleged herein.

125.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive

Amended Class Action Complaint for Violations of the Federal Securities Laws

Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Wins personnel to members of the investing public, including Plaintiffs and the Class.

126.   As a result of the foregoing, the market price of Wins securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Wins securities during the Class Period in purchasing Wins securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

127.   Had Plaintiffs and the other members of the Class been aware that the market price of Wins securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Wins securities at the artificially inflated prices that they did, or at all.

128.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

129.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(b) promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Wins securities during the Class Period.

Amended Class Action Complaint for Violations of the Federal Securities Laws

## COUNT II

**For Violations of Section 10(b) And Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

130.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder.

132.   The Class Period for Count II is from June 10, 2016, when Wins was first included in the Russell 2000 Index, to June 7, 2017, when Nasdaq halted trading in Wins ordinary shares.

133.   During the Class Period, Defendants, individually and in concert, employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(a) and (c) promulgated by the SEC, which were intended to and did: (i) deceive the investing public including Plaintiffs and putative class members; (ii) enable Wins to sustain an artificial market for its ordinary shares, and (iii) cause Plaintiffs and the putative class members to purchase overvalued Wins shares.

134.   Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Wins ordinary shares, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

135.   Defendants, directly and indirectly, engaged and participated in a comprehensive scheme and continuous course of conduct to defraud investors and manipulate the market for Wins ordinary shares. Defendants employed manipulative or deceptive devices or contrivances to deceive Plaintiffs and

Amended Class Action Complaint for Violations of the Federal Securities Laws

putative class members as to the value of Wins ordinary shares by, among other things, misleading Plaintiffs and putative class members to believe that Wins ordinary shares traded based on the natural interplay of supply and demand, not by Defendants' manipulative conduct.

136. Defendants' scheme was furthered by the use, means, or instrumentalities of interstate commerce.

137. Defendants had actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit upon the purchasers of Wins ordinary shares, as set forth herein, or acted with deliberate disregard for said conduct. If Defendants did not have actual knowledge, they were deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover the manipulative purpose, nature, and effect of their conduct.

138. As a result of the foregoing, the market prices of Wins ordinary shares failed to reflect fair or just prices and were artificially inflated during the Class Period.

139. Had Plaintiffs and the other members of the Class been aware that the market price of Wins securities had been artificially and falsely inflated by Defendants' manipulative scheme, they would not have purchased Wins securities at the artificially inflated prices that they did, or at all.

140. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

141. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which

Amended Class Action Complaint for Violations of the Federal Securities Laws

they suffered in connection with their purchase of Wins securities during the Class Period.

## COUNT III

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

142.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.   During the Class Period, the Individual Defendants participated in the operation and management of Wins, and conducted and participated, directly and indirectly, in the conduct of Wins' business affairs. Because of their senior positions, they knew the truth about Wins' principal executive offices.

144.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Wins, and to correct promptly any public statements issued by Wins which had become materially false or misleading.

145.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Wins disseminated in the marketplace during the Class Period concerning Wins. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Wins to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Wins within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Wins securities.

Amended Class Action Complaint for Violations of the Federal Securities Laws

146.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Wins.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

(a)   determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rule of Civil Procedure, and certifying Plaintiffs as Class Representatives;

(b)   awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)   awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## X.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 25, 2017                          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Amended Class Action Complaint for Violations of the Federal Securities Laws

1

Counsel for Plaintiffs

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Class Action Complaint for Violations of the Federal Securities Laws

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of August 2017 a true and correct copy of the foregoing document (with exhibits) was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*/s/* Laurence Rosen</u>

Amended Class Action Complaint for Violations of the Federal Securities Laws