fLaurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHEL DESTA, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>WINS FINANCE HOLDINGS INC., JIANMING HAO, RENHUI MU, AND JUNFENG ZHAO,<br><br>    Defendants. | Case No: 2:17-cv-02983-CAS-AGR<br><br>CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hon. Christina A. Snyder<br>Courtroom: 8D<br>Hearing Date: January 28, 2019<br>Hearing Time: 10:00 am |

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT.................................................................1

II.     FACTUAL SUMMARY ........................................................................2

III.    ARGUMENT .......................................................................................6

    A.     Class Certification is Appropriate Under Rule 23 .................................6

    B.     The Proposed Class Meets the Requirements of Rule 23(a) ................6

        1.     Numerosity .................................................................7

        2.     Commonality .............................................................7

        3.     Typicality ..................................................................8

        4.     Adequacy ...................................................................9

    C.     The Proposed Class Satisfies Rule 23(b)(3) .......................................10

        1.     Common Questions of Law and Fact Predominate over Individual Questions................................................10

        2.     A Class Action Is Superior to Other Methods for Resolving This Controversy................................................20

        3.     Damages can be calculated with a common model...................22

IV.     CONCLUSION...................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) ..............................................................................1, 11, 12, 13

*Binder v. Gillespie*,
    184 F.3d 1059 (9th Cir. 1999)..................................................................13, 14, 16

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) .......................................................................1, 6, 8, 10

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989)...................................................................passim

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003) ...........................................................................15

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ..............................................................................11, 21

*Connecticut Retirement Plans & Trust Funds v. Amgen*,
    No. 07-CV-2536, 2009 WL 2633743 (C.D. Cal. Aug. 12, 2009)........................ 8

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    718 F.3d 423, 434 (5th Cir. 2013)…………………………………………...……20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S.Ct. 2398 (2014) .......................................................................11, 13, 14

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)..................................................................7, 8, 10

*Harris v. Palm Springs Alpine Estates, Inc.*,
    329 F.2d 909 (9th Cir. 1964) ...................................................................................7

*Hatamian v. Advanced Micro Devices, Inc.*,
    No. 14-CV-00226 YGR, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)...........................................................................................11, 20, 21

*Hodges v. Akeena Solar, Inc.*,
    274 F.R.D. 259 (N.D. Cal. 2011) ...........................................................................15

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013) ...........................................................................21

*In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717 (C.D. Cal. 2002) ...........................11

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009) ......................................................................20

*In re Juniper Networks, Inc. Sec. Litig.*,
    264 F.R.D. 584 (N.D. Cal. 2009) .....................................................................21

*In re Petrobras Sec.*,
    862 F.3d 250, 277 (2d Cir. 2017). ……………………………………………11

*In re THQ, Inc. Sec. Litig.*,
    No. 00-CV-1783, 2002 WL 1832145 (C.D. Cal. Mar. 22, 2002) ........................6

*In re Valence Tech. Sec. Litig.*, No. C 95-20459 JW, 1996 WL 119468
    (N.D. Cal. Mar. 14, 1996) ................................................................................10

*Krogman v. Sterritt*
    202 F.R.D. 467, 478 (N.D. Tex. 2001)..........................................................13, 19

Lerwill v. Inflight Motion Pictures, Inc.,
    582 F.2d 507 (9th Cir. 1978) ..............................................................................9

*Levine v. SkyMall, Inc.*,
    No. CIV. 99-166-PHX-ROS, 2002 WL 31056919 (D. Ariz. May
    24, 2002) .........................................................................................................15

*Pace v. Quintanilla*,
    No. SACV 14-2067-DOC, 2014 WL 4180766 (C.D. Cal. Aug. 19,
    2014) ................................................................................................................9

*Unger v. Amedisys*,
    401 F.3d 316 (5th Cir. 2005) .........................................................................13, 19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................................8

**Statutes**
15 U.S.C. § 78u–4(e) ............................................................................................10

**Rules**
Fed. R. Civ. P. 23..............................................................................................2, 5

Fed. R. Civ. P. 23(a) ...........................................................................................5

Fed. R. Civ. P. 23(a)(1).......................................................................................6

Fed. R. Civ. P. 23(a)(2)..........................................................................................6

Fed. R. Civ. P. 23(a)(3)..........................................................................................7

Fed. R. Civ. P. 23(b)(3) ....................................................................................9, 23

Rule 23(b) ..............................................................................................................5

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

## I.  PRELIMINARY STATEMENT

Lead Plaintiff Brian Gabrich, Christopher Ikeocha, and Raymond Mentor ("Plaintiffs") bring this motion to certify this securities litigation as a class action. They seek class certification on behalf of all persons and entities who purchased or otherwise acquired the common stock of Wins Finance Holdings Inc. ("Wins") during the period from February 23, 2016 through June 7, 2017, inclusive (the "Class").[1]  Plaintiffs also request that the Court appoint each of them as class representatives and appoint Court-appointed lead counsel The Rosen Law Firm, P.A. ("Lead Counsel") as Class Counsel.

Plaintiffs, on behalf of other similarly situated investors who purchased Wins common stock at inflated prices during the Class Period, seek class certification, which will permit the efficient and effective prosecution of this action on behalf of Plaintiffs and the potentially hundreds of other shareholders who may be members of the Class. The use of class action procedures to adjudicate claims under federal securities laws has been upheld by the "overwhelming majority" of courts. *See Blackie v. Barrack*, 524 F.2d 891, 902-03 (9th Cir. 1975); *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). Courts liberally construe the requirements of Federal Rule of Civil Procedure 23 in favor of class certification of securities fraud cases in order to protect investors. "[T]he ultimate effectiveness of [the anti-fraud provisions of the securities laws] may depend on the applicability of the class action device." *Blackie*, 524 F.2d at 903 (citations omitted). As explained below, this action satisfies the requirements of Rule 23.

---

[1]  Excluded from the Class are Defendants, all present and former officers and directors of Wins and any subsidiary thereof, members of such excluded persons' families and their legal representatives, heirs, successors or assigns and any entity which such excluded persons controlled or in which they have or had a controlling interest.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

## II.    FACTUAL SUMMARY

Wins is a Cayman Islands company with operations located primarily in China.  ¶7.[2]  In October 2015, Wins went public on Nasdaq via a reverse merger, a mechanism that allows a private company to become publicly-listed in the U.S. while avoiding the typical regulatory scrutiny associated with Initial Public Offerings ¶51.

Although Wins managed to get itself listed on Nasdaq, Wins struggled to garner sufficient interest from investors, and traded at a paltry daily volume.  ¶¶12, 51.  Indeed, barely a month after going public, Wins received notification from Nasdaq in December 2015 that it would be delisted for failure to meet the initial listing requirements of Nasdaq Listing Rule 5505(a)(3), which required a company to have 300 "Round Lot" holders; in other words, Wins must have at least 300 beneficial holders with ownership of 100 or more Wins ordinary shares.  ¶¶52-53. While Wins appealed the determination and was given a reprieve, the continuing lack of investor interest in Wins meant that the Company remained at high risk of getting delisted for not meeting Nasdaq listing requirements.  ¶55.  Wins, therefore, needed a strategy to ensure long-term "compliance" with Nasdaq's minimum outside shareholding requirements, and set its eyes on the Russell 2000 Index.  ¶13.

Central to Wins' strategy to ensure adequate outside shareholding of its stock was inclusion in the Russell 2000 Index.  The Russell 2000 Index, maintained by FTSE Russell, is a small-cap stock market index of the bottom 2,000 stocks in the Russell 3000 Index, which consists of the 3,000 largest U.S. public companies and nearly 100% of the capitalization of the U.S. stock market.  ¶13.  The Russell 2000 Index is by far the most common benchmark for the many mutual funds and Exchange Traded Funds ("ETFs") that identify themselves as "small-cap and track the Russell 2000 Index.  *Id.*  Index funds that track the Russell 2000 are available

---

[2] All citations to "¶" refer to the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (Dkt. #32).

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

from most of the major mutual fund families, such as BlackRock's iShares Russell 2000 Small-Cap Index Fund and Charles Schwab's Small Cap Index Fund. *Id.*

These funds are usually passively managed by matching the performance of an index through holding all of the securities in the index, in the same proportion as the index. *Id.* In other words, if Wins is included in the Russell 2000 Index, then all of the funds tracking the Russell 2000 Index would automatically purchase Wins shares to match the entire basket of stocks in the Russell 2000 Index. ¶14. Wins would then be guaranteed to have sufficient beneficial holders to comply with Nasdaq's initial listing requirements of having 300 Round Lot Holders, as well as meet Nasdaq's continued listing requirement of having 300 public holders. ¶¶14, 52.

From the date that it went public to February 22, 2016, Wins reported in all of its filings with the U.S. Securities & Exchange Commission ("SEC") that its principal executive offices were located in Beijing, China (the "Chinese Address"). ¶38. Because its principal executive offices were not in the United States, Wins was not eligible for inclusion in the Russell 2000 Index. ¶¶15, 61, 65-67. The Russell 2000 Index is re-determined once a year; since Wins only went public in October 2015, the earliest opportunity for Wins to be included in the Russell 2000 Index was June 2016, when the composition of the Russell 2000 Index would be re-determined. ¶17.

On February 23, 2016, three months before the Russell 2000 Index was to be re-determined, Wins suddenly and for the first time represented in a SEC filing that its principal executive offices were located at 7 Times Square, 37th Floor, New York, NY (the "US Address"). ¶64. Wins was now eligible for inclusion in the Russell 2000 Index, and on June 10, 2016, Wins was included in the newly-reconstituted Russell 2000 Index. ¶18.

The US Address was ruse, as Wins actually did not have its principal executive offices there. The US Address that Wins represented as its principal executive offices was actually the address of an investment firm called ForeFront

Capital Advisors, LLC ("ForeFront"), owned by Bradley Reifler ("Reifler"), a former Wins director. ¶71. According to a senior ForeFront employee ("CW1") Wins' only "presence" at the US Address was a single, barren, temporary desk for Richard Xu, the former president of Wins, who would show up at the office sporadically. ¶¶74, 75. Moreover, although Xu resigned from Wins in July 2016, CW1 stated that Xu was last seen at the US Address in approximately late 2016 or early 2017, months after Xu's employment with Wins ended. ¶¶48,79. Hence it's not even clear that Xu was working on Wins' business during the times that he was at the US Address.

The ruse, however, had the intended effect. After its inclusion in the Russell 2000 Index, trading volume in Wins stock immediately spiked in June 2016 as mutual funds and ETFs that track the Russell 2000 Index began purchasing Wins shares in order to mirror the composition of securities in the newly-reconstituted 2016 Russell 2000 Index. ¶19. The average daily trading volume of Wins stock from June 13, 2016 to August 5, 2016 was five times that of the period from Wins' initial listing to June 10, 2016, the date that Wins was first included in the Russell 2000 Index. *Id.*

Wins' hoax soon began to collapse. On December 12, 2016, *Seeking Alpha* published an article titled "Wins Finance and the Case of the Missing Headquarter" (the "Seeking Alpha Article"), pointing out that there were no record showing that Wins existed at the US Address. ¶91. The Seeking Alpha Article further revealed that the US Address was actually occupied by ForeFront. In reaction to this adverse disclosure, Wins shares plummeted 32%, or $45.50 per share, over the next two trading days, damaging investors. ¶92. The Seeking Alpha Article, however, did not mention anything about the significance of Wins' having its principal executive offices in the U.S., or that the purpose and effect of the fake US Address was to have Wins included in the Russell 2000 Index. ¶93.

On January 9, 2017, in a Form 6-K filed with the SEC, Wins quietly changed the address of its principal executive offices back to the Chinese Address.[3] ¶94. Wins, however, remained on the Russell 2000 Index, and thus continued to be subject to artificial investor demand and continued trading at an inflated price.  ¶95.

Wins' manipulation of the Russell 2000 Index was finally revealed on March 30, 2017.  On that day, *Seeking Alpha* published another article, titled "Wins Finance – Active SEC Investigation and Manipulation of a Russell Index" ("Second Seeking Alpha Article"), which revealed for the first time that Wins intentionally used the spurious US Address to deceive FTSE into including Wins in the Russell 2000 Index. ¶96. On the same day, *Bloomberg* also published an article detailing Wins' ruse, and connecting the dots between Wins' fake US Address and the Company's inclusion in the Russell 2000 Index. ¶97. These disclosures devastated the market for Wins shares, as Wins share price dropped 48% over the next two trading days. ¶98.

The exposure of Wins' fraudulent manipulation of the Russell 2000 Index inclusion criteria prompted FTSE Russell to revise its inclusion criteria.  ¶99.  On April 3, 2017, FTSE Russell issued a publication titled "Russell US Index Reconstitution 2017 – China N Shares Construction and Methodology Update" (FTSE Update); the FTSE Update specifically singled out Chinese companies controlled by Chinese individuals or entities and stated that those companies would not be considered for inclusion in the Russell 2000 Index regardless of their satisfaction of other inclusion criteria, and such companies already on the Russell 2000 Index (e.g. Wins) would be removed from the 2017 Russell 2000 Index. *Id.* Following this announcement, Wins shares further plunged from an opening price of $146.49 on April 3, 2017 to a closing price of $81 per share on June 6, 2017, the day before Nasdaq halted trading in Wins shares. ¶100.

---

[3] Wins had filed a Form 6-K with the Chinese Address on December 14, 2016.  But on January 6, 2017, it again used the US Address on a Form 6-K.  It wasn't until the January 9, 2017 6-K that Wins permanently "switched" to the Chinese Address.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

On August 9, 2017, Wins revealed that it received a delisting determination letter from Nasdaq ("Nasdaq Delisting Letter"). ¶103. The letter informed Wins that its shares would be delisted from Nasdaq for, among other things, failure to meet the 300 Round Lot Holders requirement for initial listing on Nasdaq, failure to meet continuing listing requirements, as well as making potential misrepresentations to Nasdaq about compliance with the 300 Round Lot Holders Requirement. *Id.*

## III.   ARGUMENT

### A.   Class Certification is Appropriate Under Rule 23

The Complaint details misrepresentations of material fact that damaged potentially hundreds of similarly situated shareholders. "The law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws." *In re THQ, Inc. Sec. Litig.*, No. 00-CV-1783, 2002 WL 1832145, at * 2 (C.D. Cal. Mar. 22, 2002) (citations omitted). Any doubt as to the propriety of certification should be resolved in favor of certifying the class. *Blackie*, 524 F.2d at 901; *accord Munoz v. Giumarra Vineyards Corp.*, No. 109CV00703AWIJLT, 2016 WL 2756425, at *2 (E.D. Cal. May 12, 2016).

### B.   The Proposed Class Meets the Requirements of Rule 23(a)

For a class to be certified, Plaintiffs must satisfy the prerequisites of Rule 23(a) and one requirement of Rule 23(b). Under Rule 23(a) a plaintiff must establish: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *In re Cooper Companies Inc. Sec. Litig.,* 254 F.R.D. 628, 633 (C.D. Cal. 2009). The proposed class easily meets these requirements.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

## 1.   Numerosity

The Court will find numerosity "where the class is so numerous that joinder of all members is 'impracticable'." *Cooper*, 254 F.R.D. 628 at 633. Impracticable does not mean impossible, only that it would be difficult or inconvenient to join all members of the class. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). "No exact numerical cut-off is required, rather, the specific facts of each case must be considered." *Cooper*, 254 F.R.D. at 633. In securities cases, numerosity is presumed when millions of shares are traded during the proposed class period. *Id.*

Here, the proposed Class includes all purchasers of Wins common stock from February 23, 2016 to June 7, 2017.  Throughout the Class Period, Wins' stock was actively traded on the Nasdaq stock exchange.  Wins common stock float averaged $138.1 million during the Class Period, larger than the total market capitalization of at least 35% of all other publicly-traded companies in the U.S.  *See* Declaration of Dr. Adam Werner (the "Werner Report"), ¶77.  In *Cooper*, 254 F.R.D. at 634, the court held that that while no "exact numerical cut-off is necessary," "numerosity is presumed where the plaintiff class contains forty or more members."  Here, given that Wins was traded on Nasdaq and the size of its float during the Class Period, it is presumed that there are more than 40 purchasers of Wins stock.

This Court should, therefore, find that the Class is sufficiently numerous that joinder is impracticable.

## 2.   Commonality

A proposed class meets the commonality requirement if "there are questions of law or fact common to the class." *Cooper*, 254 F.R.D. at 634; Fed. R. Civ. P. 23(a)(2). Not all questions of fact and law need be common to satisfy Rule 23(a)(2). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). This factor is "construed permissively", and "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

disparate legal remedies within the class.'" *Id*. at 1019; *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) commonality is met when claims depend on common contention that is capable of classwide resolution).

The Complaint describes a "common course of conduct." When an issuer's public statements mislead investors in the same way "courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Cooper*, 254 F.R.D. at 634, *quoting Blackie*, 524 F.2d at 902.

Here, common questions of fact and law include: (i) whether Defendants falsely misrepresented the location of Wins' principal executive offices; (ii) whether Defendants acted with the requisite scienter; (iii) whether Defendants' misrepresentations caused losses to members of the Class; and (iv) to what extent the members of the Class have sustained damages and the proper measure of damages.

The crux of this case is that the Defendants misrepresented the address of Wins' principal executive offices. The misstatement injured all Class Members in the same way. Thus, the proposed class meets the commonality requirement. *See, e.g., Blackie*, 524 F.2d at 902-05.

**3.    Typicality**

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Cooper*, 254 F.R.D. at 635. "Typicality refers to the nature of the claim or defense of the Class Representative, and not to the specific facts from which it arose or the relief sought." *Connecticut Retirement Plans & Trust Funds v. Amgen*, No. 07-CV-2536, 2009 WL 2633743, at *5 (C.D. Cal. Aug. 12, 2009). Courts look to "whether other members have the same or similar injury, whether the action is based on conduct which is not unique

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

to the named Plaintiffs, and whether other class members have been injured by the same conduct." *Id.*

Plaintiffs satisfy the typicality requirement. The claims of all class members derive from the same legal theories and involve the same facts, that Defendants misrepresented the address of Wins' principal executive offices in order to get Wins included in the Russell 2000 Index. Plaintiffs, like the other class members, purchased Wins stock and were damaged because of Defendants' misrepresentation. Therefore, their claims are typical of those of the class.

**4.      Adequacy**

A Class Representative satisfies the adequacy requirement where the Court finds that she or he "will fairly and adequately protect the interests of the class." *Cooper*, 254 F.R.D. at 636. A proposed Class Representative who both is "able to prosecute the action vigorously through qualified counsel" and has no "antagonistic or conflicting interests with the unnamed members of the class" is adequate. *Campbell v. Vitran Express Inc.*, No. CV 11-5029 RGK (SHX), 2015 WL 7176110, at \*5 (C.D. Cal. Nov. 12, 2015) *citing Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

Plaintiffs meet these requirements. First, Plaintiffs have engaged qualified, experienced and capable attorneys. Proposed Class Counsel, The Rosen Law Firm, is highly experienced in complex class litigation, especially securities fraud actions, and has the ability and willingness to prosecute this action vigorously. *See* Firm Resume, Rosen Decl.[4] Ex. 2; *Pace v. Quintanilla*, No. SACV 14-2067-DOC, 2014 WL 4180766, at \*3 (C.D. Cal. Aug. 19, 2014) (Carter, J.) ("The Rosen Law Firm has appeared before this Court several times before, and the Court is confident that it has the necessary skill and knowledge to effectively prosecute this action.")

---

[4] All citations to "Rosen Decl." refer to the Declaration of Laurence Rosen In Support of Plaintiffs' Motion for Class Certification, filed herewith.

Second, Plaintiffs are well suited to represent the Class. Plaintiffs' interests are the same as those of the absent Class members, and there are no conflicts between them and the Class. Each Plaintiff has been actively involved in this litigation and each is willing to serve as a representative party on behalf of the class and understands his responsibility as Class Representative to protect and advance the interests of absent class members in the litigation. *See* Declarations of Plaintiffs, Rosen Decl. Exs. 3-5. Each Plaintiff is willing and able to prosecute this action on behalf of the Class to a successful conclusion. *Id.* And the interests of the proposed representatives and those of the class are aligned. All Class members have suffered losses due to their transactions in Wins stock in an artificially inflated market. It is in each of the Plaintiffs' interests, individually and together, to prosecute this action on behalf of the Class vigorously. Accordingly, Plaintiffs "will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4).

## C.   The Proposed Class Satisfies Rule 23(b)(3)

Rule 23(b)(3) requires that common questions "'predominate' over questions affecting the individual members and, on balance, a class action is superior to other available methods of adjudicating the controversy." *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 721 (C.D. Cal. 2002). Plaintiffs meet both requirements.

## 1.   Common Questions of Law and Fact Predominate over Individual Questions

Where a complaint alleges a "common course of conduct," of misleading omissions that affect all members of the class in the same manner, common questions predominate. *Blackie*, 524 F.2d at 903. In assessing whether common questions predominate, the Court's inquiry should be directed primarily toward the issue of liability. *In re Valence Tech. Sec. Litig.*, No. C 95-20459 JW, 1996 WL 119468, at *5 (N.D. Cal. Mar. 14, 1996); *see also Hanlon*, 150 F.3d at 1022 ("'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear

justification for handling the dispute on a representative rather than on an individual basis.'"). As to damages, plaintiffs need only show that "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226 YGR, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016) (*interpreting Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)).

As discussed above, common questions predominate because Defendants' omissions affected all class members in the same manner, by inflating Wins' stock price. "The predominant questions of law or fact at issue in this case are the alleged [omissions of material fact] Defendants made during the Class Period and are common to the class." *Emulex*, 210 F.R.D. at 721. Once these questions are resolved, all that remains is the mechanical computation of per share damages suffered by each class member, which will be the lesser of the magnitude of the price decline attributable to Wins' fraud, and the maximum damages permissible under the PSLRA. 15 U.S.C. § 78u–4(e).

**a.    A Presumption of Reliance Exists Because Defendants Committed a Fraud-on-the-Market**

The Supreme Court first recognized the "fraud on the market" presumption in *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). The premise of *Basic* is that in well-developed securities markets a misleading statement or omission of material fact is incorporated in the price of a stock. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2416 (2014) ("*Halliburton II*").

The Court gave several reasons for the fraud-on-the-market theory. First, the Court was concerned that without the theory and presumption of reliance, it would be impossible for any action to proceed as a class (if it alleged false statements). *Basic,* 485 U.S. at 242; *Halliburton II*, 134 S. Ct. at 2407-08 (preserving investors' ability to recover through class actions was important to *Basic*). Second, the traditional concept of actual reliance on a specific statement was an unrealistic

model of modern secondary securities markets. *Basic*, 485 U.S. at 244-45 (internal quotations omitted). Investors buy *from the market*, rather than from individual sellers, and sellers sell into it; the market itself processes the information, transmitting it to investors as the security's price. *Id.* Third, investors relied on the market price, because they relied on the assumption that information incorporated into it was true.

The Court therefore ruled in *Basic* that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247. But *Basic* left unsettled how to prove that the false information was incorporated into the stock price, which would trigger the presumption. A year after *Basic*, a district court, in a decision that would become the leading case on the subject, did so, in *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989).

As the *Cammer* court explained, plaintiffs obtain the presumption of reliance by proving that the security trades on an efficient market. Thus, the five factors articulated in *Cammer* concerned whether information was generally incorporated into that security's price: (1) whether average weekly trading volume was substantial, since such a showing implies investor interest in the company, and therefore that investors would discover new information and trade on it; (2) the number of analysts covering the company, since they disseminate information, analysis, and opinion; (3) the number of market makers, since they would quickly buy and sell stock when new news was released; (4) whether the company was eligible to file a registration statement on Form S-3, since this form presumes that an issuer's stock trades on an efficient market, and (5) whether the Plaintiffs has shown instances when the company's stock price reacted to corporate news. *Cammer*, 711 F. Supp. at 1285, 1286-87. The Ninth Circuit has approved of the *Cammer* approach. *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999).

The fifth *Cammer* factor – which proffers direct evidence of a cause and effect relationship between news and stock price - is most critical, and decisive. Indeed, the Second Circuit has stated that the fifth *Cammer* factor alone is a "sufficient" to show market efficiency. *In re Petrobras Sec.*, 862 F.3d 250, 277 (2d Cir. 2017).

Later court decisions added new factors, but did not reconsider *Cammer*'s contention that a Plaintiff proves that the stock price incorporated the defendants' false statements by showing that it generally incorporates news. In *Unger v. Amedisys*, the Fifth Circuit listed three additional factors that all touched on the stock's market efficiency: (6) market capitalization, since according to *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), there is greater incentive to invest in more highly capitalized companies; (7) bid-ask spread, since a low bid-ask spread makes a stock inexpensive to trade; and (8) size of the float, which is market capitalization minus insider holdings, since insiders may have nonpublic information that is not yet reflected in stock prices. *Unger v. Amedisys*, 401 F.3d 316, 324 (5th Cir. 2005); *see also Krogman*, 202 F.R.D. at 478.

In *Halliburton II* the Court clarified the standard for fraud on the market. *Halliburton II*, 134 S. Ct. 2398. *Halliburton II* reaffirmed the efficient market presumption in *Basic*, but clarified that the prerequisites to the presumption: (i) proof that the misrepresentation or omission of fact was material, (ii) was issued publicly, and (iii) the security traded in an efficient market, were proxies for the fact that underlies the presumption of reliance: that the misrepresentation or omission affected the market price of the security (i.e. "price impact"). *Halliburton II* clarified that a plaintiff can show fraud on the market ***either*** by providing evidence that the company's stock generally traded on an efficient market, ***or*** by direct evidence that the misleading statement had a price impact. *Halliburton II*, 134 S. Ct. at 2415. Defendants, by the same token, may also show a lack of price impact by direct evidence. *Id. Halliburton II* also characterized the premise

underlying the presumption of reliance as "fairly modest," and based on nothing more than that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id.* at 2408 (citation omitted).

The holding that a plaintiff need not show price impact directly leaves alive and unchanged the lower court precedent establishing that a plaintiff who shows that a stock trades on an efficient market is entitled to a presumption of reliance. But plaintiffs may now *also* show that they are entitled to a presumption of reliance through direct evidence that the misrepresentation or omission had an impact on the stock's price (i.e., caused the price to be inflated).

i.      *Cammer* **Factors Demonstrate Market Efficiency**

As noted above, the Ninth Circuit uses the "*Cammer*" factors to determine whether an efficient market is established. *See Binder*, 184 F.3d at 1064 (*citing Cammer*, 711 F. Supp. at 1286-87). Dr. Werner's holistic analysis of the *Cammer* factors and other indicia of market efficiency demonstrate that Wins common stock traded in an efficient market during the Class Period.

**Factor One — Weekly Trading Volume:** "[A] large weekly volume of stock trades … implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. The average weekly trading volume for Wins stock during the Class Period was 3.39% of float. See Werner Report, ¶30. The 3.39% weekly turnover far exceeds the 2.0% weekly turnover that the *Cammer* court explained would justify a "strong presumption of an efficient market." *Cammer*, 713 F. Supp. at 1286. Therefore, this factor weighs strongly in favor of a presumption of reliance. *Id.*

**Factor Two — Analyst Reports:** Analyst coverage of a stock implies that information about the company is rapidly reflected in the stock price. *Cammer*, 713 F. Supp. at 1286.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

During the Class Period, at least 323 news articles, press releases, and SEC filings featuring Wins appeared in major financial publications and newswires, including *Dow Jones Institutional News*, *PR Newswire, and Reuters News*. Werner Report ¶34. There were at least six articles by five different authors on *Seeking Alpha* – a well-known online stock commentary website that publishes investment analyses – during the Class Period concerning Wins. *Id.* at ¶33.  The sheer volume of news stories and coverage also supports an efficient market because the flow of material information to the marketplace promotes market efficiency. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (524 news items over two years showed efficient market); *see also* Werner Report, ¶¶31-32.

**Factor Three — Market Makers:** "The existence of market makers and arbitrageurs… ensure[s] completion of the market mechanism" because these individuals "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87; Werner Report at ¶¶35-39. Here, there were at least 62 market makers for Wins common stock during the Class Period, which is enough to conclude that Wins common stock traded in an open, well-developed and efficient market throughout the Class Period. Werner Report at ¶¶37.  This exceeds the number of market makers that Courts in this circuit have required to satisfy this *Cammer* factor. *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) (certification approved with more than 20 market makers); *Levine v. SkyMall, Inc.*, No. CIV. 99-166-PHX-ROS, 2002 WL 31056919, at *6 (D. Ariz. May 24, 2002) (22 market makers).

**Factor Four — S-3 Eligibility:** A firm's ability to file a Form S-3 Registration Statement is indicative of market efficiency. *Cammer*, 711 F. Supp. at 1286-87; Werner Report at ¶40. The SEC has explained that the rationale for the S-3 designations was "predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosures in the Exchange Act reports

and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place." *Id.* at 1284 (citing SEC Securities Exchange Act Release No. 6331 (August 13, 1981)).

In order for a company to be eligible to file a Form S-3 Registration Statement, the SEC requires 12 months of filings and at least $75 million of float. Werner Report at ¶40. Wins clearly met those criteria and was eligible to file a Form S-3. *Id.* Thus, the fourth *Cammer* factor is satisfied.

**Factor Five — Cause-Effect Relationship of Unexpected Material News and Stock Price:** This factor requires showing that there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price." *Binder*, 184 F.3d at 1065 (*quoting Cammer*, 711 F. Supp. at 1287). Dr. Werner employed an event study covering the Class Period to determine the impact of new material information on Wins' stock price. Werner Report, ¶¶43-71. The event study included the dates December 12, 2016, the date on which a research report appeared on *Seeking Alpha* stating that Wins was not at the address of its U.S. principal executive offices; March 30, 2017; when a research report appeared on *Seeking Alpha* revealing that Wins "tricked" the FTSE Russell and will likely be removed from the Russell 2000 Index for falsifying the address of its principal executive addresses and that the SEC was investigating Wins; and March 31, 2017, the first trading day after *Bloomberg* published an article after market close on March 30, 2017, detailing Wins' market manipulation scheme involving its fake US Address and the Russell 2000 Index, and reporting that a Hong Kong-based company's plan to acquire a majority stake in Wins at a steep discount was being delayed.

*December 12, 2016*: On December 12, 2016, a research report appeared on *Seeking Alpha* stating that Wins was not at the US Address. Wins stock fell

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

22.12% on a logarithmic basis. The abnormal stock price return[5] was -21.25% on December 12, 2016, an unusually large one day decline for Wins common stock. It represents a strongly statistically-significant price reaction to new, adverse Company-specific news, and is too severe to have been a random fluctuation. The likelihood of this stock price drop in the absence of the disclosures in this *Seeking Alpha* article is less than 5.0%. This result proves that the market for Wins common stock was efficient. Werner Report, ¶¶66-67.

*March 30, 2017*: On March 30, 2017, *Seeking Alpha* published an article stating, among other things, that Wins lied about having its principal executive offices in the U.S. in order to "trick" the FTSE Russell to including Wins in the Russell 2000 Index. The article mentioned that Wins would likely be removed from the Russell 2000 Index, and that the SEC was investigating Wins. The abnormal return of -22.27% on March 30, 2017 is another strongly-statically significant price reaction to this new, adverse Company-specific news. This abnormal return was too severe to have been a random fluctuation. The likelihood of this stock price drop in the absence of the disclosures in this *Seeking Alpha* article is less than 4.0%. As such, it is another direct evidence of market efficiency. Werner Report, ¶¶68-69.

*March 31, 2017*: After the close of trading on March 30, 2017, *Bloomberg* published an article that provided comprehensive coverage on Wins' market manipulation scheme involving its fake US Address and the Russell 2000 Index. This article also delved into the backgrounds of certain Wins executives and their past affiliation with other Chinese companies that had been accused of fraud. The

---

[5] A statistical regression analysis is used to determine how much of a stock price change is explained by market and peer group factors, rather than company-specific information. The "abnormal return" (or "residual return" or "residual stock price movement") is that change in stock price not attributable to market and peer group factors. Werner Report, ¶56.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

article also reported that a Wins insider was trying to unload his shares at a steep discount, but the Hong Kong company that would be buying his shares had to delay the transaction.  The residual return of -8.48% on March 31, 2017, the first trading day following the publication of the *Bloomberg* article, is another unusually large one day decline for Wins stock. The drop in stock price is too severe to have been a random fluctuation, and is statistically significant. The likelihood of this stock price drop in the absence of the disclosures in the *Bloomberg* article is less than 0.005%. This is convincing evidence of market efficiency. Werner Report, ¶¶70-71.

*Event Study Conclusion*: The Event Study demonstrated a statistically significant cause and effect relationship between the release of new Company-specific information and movements in Wins' stock price during the Class Period. This result proves not only that the market for Wins stock was efficient, but also that it was efficient specifically with respect to the information at issue in this case. The event studies provide cogent, direct evidence of market efficiency and price impact.

**ii.    The *Unger/Krogman* Factors Indicate Market Efficiency**

In addition to the *Cammer* factors discussed above, the proposed Class herein also satisfies additional factors espoused by the Fifth Circuit in *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005), and the court in *Krogman* as demonstrative of market efficiency. *See also DVI*, 639 F.3d at 633 n.14 (listing additional "*Krogman*" factors considered in assessing market efficiency). *See* Werner Report at ¶¶72-81.

*Market Capitalization*: The court in *Krogman* held that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." 202 F.R.D. at 478.  During the Class Period, Wins' average market capitalization was $1.8 billion, which is larger than at least 70% of all other publicly-traded companies in the United States, further indicating the presence of market efficiency in this case.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION
2:15-CV-05146-CAS-JEM

Werner Report, ¶¶73-76

*Size of the Float*: The stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities. It is generally the number of shares available for trading by outside investors in the open market. Float is highly correlated with market capitalization, but it focuses on the shares available for trading rather than all outstanding shares. Stocks with large levels of float tend to trade more actively, attract more analyst and news media coverage, and garner the attention of greater numbers of investors, including large institutional investors. All of these characteristics, which accompany a high float level, promote market efficiency. During the Class Period, Wins' average common stock float averaged $138.1 million. Wins' float was larger than the total market capitalization of at least 35% of all other publicly-traded companies in the U.S. The magnitude of Wins' float indicates that it satisfies the second *Unger*/*Krogman* factor for market efficiency. Werner Report, ¶77-78.

**iii.    *The Fraud alleged in the Complaint had an Impact on the Price of Wins Stock***

*Halliburton II* clarified that a plaintiff can show entitlement to the fraud-on-the-market presumption of reliance ***either*** by providing evidence that the company's stock generally traded on an efficient market, ***or*** by direct evidence that the misleading statement had a price impact. This is because market efficiency is a mere proxy for the ultimate question:[6] did Defendants' fraudulent statements have an impact on the stock price – was the fraud incorporated into the stock price?

Because Dr. Werner has found direct evidence of price impact from the December 12, 2016 and March 30, 2017 corrective disclosures as discussed above, a presumption of reliance is warranted. Indeed, Wins' stock suffered statistically

---

[6] *Halliburton II,* 134 S.Ct. at 2415-16 (market efficiency is "nothing more than" a prerequisite for an "indirect showing" of price impact; an "indirect proxy should not preclude direct evidence when such evidence is available.")

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

significant stock drops following each revelation of Wins' fraud: on December 12, 2016, following the publication of the First Seeking Alpha Report (reporting that Wins was not at the US Address), Werner Report, ¶¶66-67; on March 30, 2017, following the publication of the Second Seeking Alpha Report (reporting that Wins lied about the US Address in order to get on the Russell Index), Werner Report, ¶¶68-69; and on March 31, 2017, the first trading day following the market-close publication of the Bloomberg Article (with additional reporting on Wins' market manipulation scheme); Werner Report, ¶¶70-71. These statistically significant stock drops show price impact. *Erica P. John Fund, Inc. v. Halliburton Co.,* 718 F.3d 423, 434 (5th Cir. 2013) ("*Halliburton I*") (vacated on other grounds by *Halliburton II)* ("Price impact can be shown *either* by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud.")*; see also Hatamian v. Advanced Micro Devices, Inc.,* 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016).

Moreover, Dr. Werner also found that inclusion in the Russell 2000 Index had a substantial effect on the price and market for Wins stock during the Class Period. Following Wins' inclusion in the Russell 2000 Index, trading volume and institutional holdings increased significant, and Wins' share price increased over time, from $11.39 on March 31, 2016, to $15.50 on June 30, 2016, to $29.57 on September 30, 2016, and to $180.00 on December 30, 2016. Werner Report, ¶¶84.

In conclusion, because Defendants' misrepresentation allowed it to be included in the Russell 2000 Index, leading to a marked increase in investor demand and a skyrocketing stock price, and Wins' stock price suffered statistically significant declines following each revelation of the fraud, Plaintiffs have demonstrated the essence of market efficiency – that Defendants' fraud caused Wins' stock price to increase. Werner Report, ¶¶82-86.

**2.      A Class Action Is Superior to Other Methods for Resolving This Controversy**

Rule 23(b)(3) also requires the Court to determine that "a class action is

superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Courts have recognized that the class action device is superior to other available methods for managing litigation involving a large number of purchasers of securities injured by violations of the securities laws. "[C]lass action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 284 (N.D. Ala. 2009); *In re Countrywide Financial Corp Sec. Litig.*, 273 F.R.D. 586, 623-24 (C.D. Cal. 2009) (superiority clearly met where parties "need only establish what happened within Countrywide, when, and who knew (or should have known)"). In determining the issue of superiority, Rule 23(b)(3) enumerates the following factors that this court should consider:

> (1) the class members' interests in individually controlling the prosecution . . . of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by . . . class members, (3) the desirability . . . of concentrating the litigation of the claims in the particular forum, and (4) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Each factor is satisfied here. The number of class members is too numerous and the typical claim is too small for each class member to maintain separate actions. Moreover, the nationwide geographical dispersion of the class members, based upon Wins' sale of stock on a national exchange, makes it desirable that litigation of the claims involved be concentrated in this forum. *See In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 593 (N.D. Cal. 2009) ("it is almost certain that there will be thousands of class members. Where thousands of identical complaints would have to be filed, it is superior to concentrate claims through a class action in a single forum"). Finally, Plaintiffs foresee no management difficulties that would preclude this action from being maintained as a class action and are confident that any potential management problems can be addressed and resolved by the parties or by this Court.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

### 3. Damages can be calculated with a common model

*Comcast* held that an antitrust class could not be certified because the damages model calculated damages that flowed from four theories of antitrust impact, three of which were already rejected by the Court. *Comcast*, 133 S. Ct. 1426, 1434, 185 L. Ed. 2d 515 (2013). For that reason, there was a mismatch between the method of the class wide damages calculation, and the theory of class-wide proof. In *Comcast*, the Court noted, it was possible that some class members were damaged primarily by noncompensable harms, while other class members were damaged primarily by compensable harms. *Id.*

Here, Dr. Werner opines that per-share damages can be measured on a class-wide basis using an event study. Werner Report, ¶90. In fact, "[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013). *Hatamian*, 2016 WL 1042502, at *9. At class certification, it is not necessary actually to conduct an event study. *Hatamian*, 2016 WL 1042502, at *8 (sufficient for plaintiffs to "propose" event study methodology).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request entry of an order certifying this action as a class action, appointing Brian Gabrich, Christopher Ikeocha, and Raymond Mentor as Class Representatives, and appointing The Rosen Law Firm, P.A. as Class Counsel. Should the Court grant this motion, as provided in the [Proposed] Order filed herewith, the Court should direct the parties to meet and confer on the form and manner of providing notice and require the parties to file their proposal for providing notice for Court approval within sixty days from entry of the Order granting class certification.

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

Dated: September 17, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Yu Shi (*pro hac vice*)
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiffs*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Plaintiff*

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM

## <u>CERTIFICATE OF SERVICE</u>

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On September 17, 2018, I electronically filed the foregoing NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on September 17, 2018.

/s/ Laurence Rosen
Laurence Rosen

MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
2:15-CV-05146-CAS-JEM